**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| In Re Subpoena Issued to<br>Birch Communications, Inc. f/k/a<br>CBeyond Communications, LLC | Case No. 1:14-mi-00110-WSD-JFK |

**RIGHTSCORP'S RESPONSE TO CBEYOND'S**
**MOTION TO QUASH SUBPOENA AND FOR SANCTIONS**

## I.    INTRODUCTION

Rightscorp, Inc. ("Rightscorp") is a technology company that works on behalf of copyright owners to identify online infringements. Upon identifying an infringement, Rightscorp notifies the service provider facilitating the infringement in accordance with the provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512. Rightscorp is an authorized agent of BMG Rights Management (US) LLC ("BMG"), one of the largest music publishers in the world, and other rights holders who own or have the exclusive rights to the copyrights in numerous popular musical works, sound recordings, and movies.

On behalf of BMG, Rightscorp served the subpoena at issue on Birch Communications, Inc. f/k/a CBeyond Communications, LLC ("CBeyond") (attached as Exhibit A to CBeyond's Motion), pursuant to Section 512(h), to identify the CBeyond subscribers responsible for 1,326 separate instances of

copyright infringement (the "Rightscorp Subpoena"). The works infringed include musical works by Ray Charles, Adele, and Outkast, among other well-known artists.

CBeyond's motion to quash the Rightscorp Subpoena and for sanctions largely turns on whether Section 512(h) applies to service providers that only provide "transitory" functions (as described in Section 512(a)). CBeyond relies heavily on *Recording Industry Association of America, Inc. v. Verizon Internet Services, Inc.*, 351 F.3d 1229 (D.C. Cir. 2003) ("Verizon III") and the majority opinion in *In re Charter Communications, Inc., Subpoena Enforcement Matter*, 393 F.3d 771 (8th Cir. 2005) ("Charter Majority") to argue that Section 512(h) does not apply to these types of service providers. In contrast, the district court opinions in *Verizon*, *In re Verizon Internet Services, Inc.*, 240 F. Supp. 2d 24 (D.D.C. 2003) ("Verizon I"); 257 F. Supp. 2d 244 (D.D.C. 2003) ("Verizon II"), and the dissenting opinion in *Charter* ("Charter Dissent") squarely support the view that Section 512(h) reaches *all* types of service providers.

This issue, however, is one of first impression in the Eleventh Circuit. For the reasons set forth below, the text, structure, purpose, and legislative history of the DMCA all lead to the unmistakable conclusion that Section 512(h) authorizes

the Rightscorp Subpoena to CBeyond. CBeyond's motion to quash and for

sanctions must, therefore, be denied.

## II.      BACKGROUND

### A.     Internet Piracy.

Nearly from the advent of the Internet, digital piracy of copyrighted works

has been a vexing problem for rights holders. Initially, Internet users were posting

copyrighted works on electronic bulletin boards. Later, notorious peer-to-peer

("P2P") networks such as Napster became the preferred forum to exchange pirated

music, movies, and other copyrighted media. With Napster and similar P2P

networks, a single file was transferred directly from one "peer" to another. Because

of this, the amount of time required to download a file using one of these networks

depended on the strength of the Internet connection between peers.

More recently, BitTorrent protocols have become the go-to method of online

infringement because these protocols offer those wishing to pilfer copyrighted

content several advantages over traditional P2P networks and make it more

difficult for copyright owners to enforce their rights. BitTorrent protocols break

files into "pieces," and an individual infringer can acquire the various pieces of the

file at the same time from various peers. And "at any given time, each user is both

downloading and uploading several different pieces of a file from and to multiple

3

other users; the collection of peers swapping pieces with each other is known as a 'swarm.'" *Columbia Pictures Indus. v. Fung*, 710 F.3d 1020, 1024-27 (9th Cir. 2013) (explaining the differences between the various P2P methods). As a result, illegal downloads occur much faster using BitTorrent, particularly for large files.

The statistics on digital piracy are staggering. For example, just to cite a few:

- Since Napster emerged, music sales in the U.S. have ***dropped 53%***, from $14.6 billion to $7.0 billion in 2013.

- From 2004 through 2009 alone, approximately ***30 billion songs*** were illegally downloaded on file-sharing networks.

- ***Only 37% of music*** acquired by U.S. consumers in 2009 was paid for.

- The digital theft of music, movies and copyrighted content takes up huge amounts of Internet bandwidth—17.5% in the U.S.

*See* RIAA, "Piracy: Scope of the Problem," www.riaa.com.

## B.    DMCA: The Negotiated Compromise.

In 1998, Congress enacted the DMCA, which was a compromise between two competing concerns. On one hand, Congress wanted to thwart the "massive piracy" of copyrighted works on the Internet. S. Rep. No. 105-190, at 8 (1998). On the other hand, Congress hoped to encourage development of the Internet by providing service providers with some certainty that they would not incur liability for infringement by their users if they cooperated with rights holders.

This compromise is reflected in a series of "safe harbors" set forth in subsections (a)-(d) of Section 512. Each safe harbor addresses a different function. Subsection (a) limits the liability of "transitory" service providers—that is, service providers that act as a mere conduit. Subsections (b) through (d) limit the liability of service providers that are caching, storing, or linking to infringing material.

In order to avail themselves of the safe harbors, however, service providers must adopt and reasonably implement "a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). Subsections (b) through (d) also require service providers to remove or disable access to infringing material upon receipt of a notification of infringement.

Section 512 also imposes other important obligations on service providers. Most notably, for purposes of CBeyond's Motion, subsection (h) *requires service providers to disclose to rights holders the identity of subscribers using their networks to infringe copyrights*. The ability to subpoena service providers for this information has become critically important in combatting piracy on P2P networks. As explained by Judge Murphy in *Charter Dissent*, the "only viable way" for rights holders to vindicate their rights in a timely manner against individual subscribers is to subpoena service providers for the identities of infringers. 393

F.3d at 779. Otherwise, the infringements by that subscriber will continue, and multiply, unchecked (unless the service provider terminates the subscriber's account for being a "repeat infringer").

After receiving a Section 512(h) subpoena, the service provider is required to "expeditiously disclose" the identities of the infringing subscribers. 17 U.S.C. § 512(h)(5). This obligation arises regardless of whether the service provider has any duty to remove or disable access to the infringing material. *Id.*

The issuance of a subpoena by the court clerk upon compliance with the requirements of Section 512(h) is not discretionary. Nevertheless, Section 512(h) contains a number of built-in safeguards to prevent abuse. First, the rights holder or its agent must possess a "good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v). Second, the notification of infringement must identify the works being infringed and include a declaration under penalty of perjury that the party seeking the subpoena owns the works or is authorized by the owner. 17 U.S.C. § 512(c)(3)(A)(ii), (vi). Third, the party seeking the subpoena must attest "that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title." 17 U.S.C. § 512(h)(2)(C).

**C.**     **Rightscorp's Subpoena to CBeyond.**

Rightscorp's technology identifies infringements of its clients' works on BitTorrent networks and extracts certain information regarding those infringements, including the work being infringed, the date and time of the infringement, the IP address of the infringer, and the Internet service provider that is facilitating the infringement. Rightscorp's proprietary technology is unique because it is able to identify if a particular infringer is distributing an entire work rather than only a piece of the work. Only where the system confirms that a single user on the BitTorrent network is sharing an entire work does the Rightscorp system register a particular instance of infringement.

Rightscorp identified 1,326 separate instances of infringement occurring during a two-month period from June 26, 2014 to August 26, 2014 by CBeyond subscribers with an IP address in this district. The Rightscorp Subpoena, in accordance with Section 512(h), properly and lawfully seeks identifying information for these subscribers, which Rightscorp cannot determine otherwise.

### III.     ARGUMENT

**A.**     **Section 512(h) Explicitly Authorizes Rightscorp's Subpoena.**

CBeyond has the burden of persuasion on its motion to quash Rightscorp's subpoena. 9A Charles Alan Wright et al., *Federal Practice and Procedure* § 2459

(3d ed. 2014). CBeyond contends that Section 512(h) does not apply to Section 512(a) service providers.[1] (Mem. at 5-8.) CBeyond's interpretation of the statute is at odds with the text, structure, purpose, and legislative history of the DMCA.

### 1.    The Plain and Unambiguous Text of Section 512(h) Authorizes Subpoenas to Service Providers, Regardless of Type.

"The first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute." *United States v. Fisher*, 289 F.3d 1329, 1337-38 (11th Cir. 2002) (citation and quotation marks omitted). In applying this rule, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotation marks omitted); *see also CBS Inc. v. Primetime 24 Joint Venture*, 245 F.3d 1217, 1225 (11th Cir. 2001) (noting that courts must determine the meaning of a statutory provision within "the broader, statutory context").

Section 512(h) applies to "service providers." Specifically, it permits rights holders or their agents to obtain "a subpoena to a *service provider* for identification of an alleged infringer in accordance with this subsection." 17 U.S.C. § 512(h)(1)

---

[1] Rightscorp does not in any way concede that CBeyond is entitled to invoke the protections of Section 512(a) to avoid liability, but Rightscorp assumes for purposes of this Motion, because Rightscorp has no way to confirm at this stage, that CBeyond is not exercising any of the functions addressed by subsections (b) through (d) (i.e., caching, storing, or linking to) for the infringements at issue.

(emphasis added). "The subpoena shall authorize and order the *service provider* receiving the notification and the subpoena to expeditiously disclose . . . information sufficient to identify the alleged infringer . . . ." *Id.* at § 512(h)(3) (emphasis added). If the subpoena is in the proper form, "the clerk shall expeditiously issue and sign the proposed subpoena and return it to the requester for delivery to the *service provider*." *Id.* at § 512(h)(4) (emphasis added). "Upon receipt of the issued subpoena, . . . the *service provider* shall expeditiously disclose to the copyright owner or person authorized by the copyright owner the information required by the subpoena . . . ." *Id.* at § 512(h)(5) (emphasis added).

This begs the question: Is CBeyond a "service provider" within the meaning of the DMCA? The statute unambiguously answers that question in the affirmative.

"It is an elementary precept of statutory construction that the definition of a term in the definitional section of a statute controls the construction of that term wherever it appears throughout the statute." *Fla. Dep't of Banking & Fin. v. Bd. of Governors of Fed. Reserve Sys.*, 800 F.2d 1534, 1536 (11th Cir. 1986). Subsection (k) defines "service provider" differently for purposes of subsection (a), on one hand, and subsections (b), (c), and (d), on the other hand:

> (A)     As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified

by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

(B)     As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, ***and includes an entity described in subparagraph (A)***.

17 U.S.C. § 512(k) (emphasis added). Notably, however, the second definition "includes an entity described in [the first definition]." *See also* S. Rep. No. 105-190, at 54 ("The second definition of 'service provider' . . . applies to the term as used ***in any other subsection of section 512***.") (emphasis added). In other words, ***there is not a definition of "service provider" that does not include CBeyond***. Since the definition of "service provider" in the DMCA encompasses transitory service providers such as CBeyond, there can be no question that Section 512(h) authorizes the Rightscorp Subpoena.

**2.     The Reference to Subsection (c)(3)(A) in Section 512(h) Does Not Support CBeyond's Interpretation of the Statute.**

CBeyond argues that Section 512(h) was not intended to address Section 512(a) service providers because one of the conditions of a valid subpoena is that the request include a notification of claimed infringement that "satisfies the provisions of subsection (c)(3)(A)." (Mem. at 7-8 (citing *Verizon III* and *Charter Majority*).) Subsection (c)(3)(A) provides that a notification must include "substantially," among other information, "[i]dentification of the material that is

claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material." 17 U.S.C. § 512(c)(3)(A). Because, CBeyond contends, it cannot "locate" or "remove or disable access to" the infringing material, the conclusion it draws is that CBeyond cannot be compelled to respond to the subpoena. CBeyond's interpretation, however, cannot be reconciled with the plain language of the statute because it ignores the definition of "service provider" in Section 512(k), in contravention of well-established rules of statutory construction. *See Fla. Dep't of Banking & Fin.*, 800 F.2d at 1536.

Moreover, the faulty inference that CBeyond derives from the cross-reference to subsection (c)(3)(A) is not supported by the structure of the DMCA. Although subsection (c)(3)(A) is included within the subsection addressing the safe harbor for Section 512(c) service providers, it is referenced throughout the DMCA. For example, the safe harbor provisions in subsections (b) and (d) refer to subsection (c)(3)(A) for their notification requirements, even though a service providers ability to "locate" and "remove or disable access to" will look much different when the infringing material is cached (subsection (b)) or linked to (subsection (d)) rather than stored (subsection (c)). The most sensible reading of the statute is that Congress referenced subsection (c)(3)(A) in multiples places in

the DMCA, including in Section 512(h), simply to avoid the necessity of repeating notice details and further complicating an already complex statute rather than to limit the reach of Section 512(h).

As the court aptly noted in *Verizon I*, "[i]f Congress intended to restrict or limit the subsection (h) subpoena authority based on where the infringing material resides, one would expect to see that limitation spelled out in subsection (h). 240 F. Supp. 2d at 33. It is not. There is nothing in the statute indicating that Congress intended to exclude an entire class of "service providers" from the reach of Section 512(h). For example, Congress easily could have used two defined terms for service providers (e.g., "Transitory Service Provider" and "Storage Service Provider"). But it did not. Congress defined "service provider" to include all types of service providers and then used that definition throughout Section 512(h).

And that is for good reason. There is no justification whatsoever to limit the subpoena authority under subsection (h) to exclude Section 512(a) service providers. The burden for the service provider to identify infringers based on an IP Address is the same regardless of which safe harbor is implicated.

Notably, the subpoena provision is, in fact, even more necessary in the case of Section 512(a) service providers because there is not an obligation to disable access to the infringing material (except to terminate the account of a repeat

infringer). Thus, unlike under subsections (b) through (d), a rights holder often has no other recourse than to pursue the users who are illegally sharing copyrighted materials. *See Charter Dissent*, 393 F.3d at 778 ("By using the § 512(h) subpoena power to learn the identity of conduit service subscribers who infringe, *copyright holders are able to take steps to protect their interests, seek compensation for their misappropriated property, and stop infringement*.") (emphasis added). Rights holders, however, cannot seek this recourse without the identity of the infringer.[2]

And CBeyond's interpretation requires a rights holder to guess which safe harbors are implicated by the service provider's activities. For example, how would a rights holder know when it issues a subpoena whether the service provider stores a file on its servers for more than a transitory duration and thus even qualifies for the Section 512(a) safe harbor?[3] *See* 17 U.S.C. § 512(a)(4). It defies logic that Congress would have intended for rights holders to make that

---

[2] While a rights holder can bring a "John Doe" action and seek a subpoena pursuant to Rule 45 of the Federal Rules of Civil Procedure, this process imposes additional burdens on rights holders' ability to pursue infringers and is less timely. *See Verizon I*, 240 F. Supp. 2d at 39-41; *see also Charter Dissent*, 393 F.3d at 780 ("If the notification and declaration are in proper form, the clerk shall issue the subpoena 'expeditiously.' § 512(h)(4). This permits a copyright owner to proceed directly against an infringer without delay and thereby avoid further losses."), 782.

[3] For that same reason, it is not even necessarily factually true that the service provider cannot "remove" or "disable access to" the infringing material.

determination before issuing a subpoena, especially when Congress referred to the subpoena provisions throughout Section 512(h) as an "expeditious" process.

As the court pointed out in *Verizon I*, "whatever rationale warrants distinguishing among subsections (a) through (d) for purposes of the safe harbor liability protections, ***there is no corresponding rationale for such distinctions regarding a subpoena power that entails merely identifying infringers***." 240 F. Supp. 2d at 34 (emphasis added). "A coherent reading of the text and structure of the statute reinforces the message of these sections, which is that the subpoena power created by § 512(h) ***was intended for use against all types of service providers***." *Charter Dissent*, 393 F.3d at 782 (emphasis added); *see also Verizon I*, 240 F. Supp. 2d at 36 ("The Court can find nothing in the language or structure of the statute that suggests Congress intended the DMCA to protect only a very limited portion of copyrighted material on the Internet.").

### 3. CBeyond's Interpretation of Section 512(h) Undermines Congress's Purpose, as Expressed in the Legislative History.

Since the plain and unambiguous language of Section 512(h) authorizes a subpoena to CBeyond, this Court need not delve into the legislative history of the DMCA to interpret the meaning of the statute. But to the extent this Court were to find the language of the statute ambiguous, any such ambiguity may be resolved by looking at extrinsic evidence of Congressional intent, including legislative history.

*Fed. Reserve Bank of Atlanta v. Thomas*, 220 F. 3d 1235, 1239 (11th Cir. 2000);

*Halperin v. Reg'l Adjust. Bureau, Inc.*, 206 F.3d 1063, 1067-68 (11th Cir.2000)

(reviewing legislative history to resolve "internal inconsistency" in statute).

 The DMCA was enacted to address "massive piracy," Sen. Rep. 105-190, at

8, and that problem exists as much or more so today than it did then. Congress

sought to balance concerns about piracy and the threat of liability for service

providers in Section 512. Service providers are provided greater certainty

concerning their legal exposure, but in return, service providers are required to

identify infringing users so that rights holders can more directly address piracy.

*Charter Dissent*, 393 F.3d at 778 (noting that the DMCA in certain circumstances

"limited the liability of ISPs for infringement by their customers and provided

copyright holders more direct means to attack digital piracy").

 Indeed, Congress made clear that Section 512 was intended to preserve the

"strong incentives for service providers and copyright owners to cooperate to

detect and deal with copyright infringements that take place in the digital

networked environment." S. Rep. No. 105-190, at 20. CBeyond's interpretation

eviscerates the compromise struck by Congress. As noted by the court in *Verizon I*,

it "would create a huge loophole in Congress's effort to prevent copyright

infringement on the Internet" by excluding from the subpoena power a huge swath of service providers. 240 F. Supp. 2d at 35.

In addition to the overall purpose and objectives of the DMCA, which buttress Rightscorp's position, the lack of *any* mention of CBeyond's proposed limitation on the scope of Section 512(h) is telling. Given the significant interests that were at stake when enacting the DMCA, there is an extensive legislative record. If Congress intended to carve out a "huge loophole," one would expect to see considerable debate over the issue. No such debate occurred precisely because no one—not Congress, not the rights holders, not the service providers—viewed Section 512(h) as limited to subsection (b), (c), and (d) service providers.

In short, the text, structure, purpose, and legislative history of the DMCA all point to the same inescapable conclusion: the Section 512(h) subpoena provision applies to all types of "service providers," including CBeyond.

**B.    Section 512(h) Does Not Violate the Case-or-Controversy Requirement of Article III.**

CBeyond contends that if Section 512(h) authorizes the Rightscorp Subpoena, this subsection is unconstitutional because it does not originate from a pending lawsuit and thus violates Article III's case-or-controversy requirement. (Mem. at 11-12.) Every judge that has addressed this issue has determined that Section 512(h) is constitutional. *See Charter Dissent*, 393 F.3d at 783-84; *Verizon*

*II*, 257 F. Supp. 2d 244, 248-57. For the same reasons articulated by Judges Murphy and Bates in those decisions, CBeyond's argument fails.

Courts have long recognized that ministerial duties of a court clerk do not require judicial power and thus do not require a case or controversy under Article III. *See, e.g.*, *Custiss v. Georgetown & Alexandria Turnpike Co.*, 10 U.S. 233, 236 (1810) (statutory duty of clerk to record jury inquisitions a "ministerial act" that "requires no exercise of judicial functions"); *see also Verizon II*, 257 F. Supp. 2d at 250 (citing cases). A ministerial duty "is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law." *Mississippi v. Johnson*, 71 U.S. 475, 498 (1866).

Congress specifically contemplated that issuance of a Section 512(h) subpoena would be a ministerial duty: "The issuing of the order should be a *ministerial function* performed quickly for this provision to have its intended effect." S. Rep. No. 105-190, at 51 (emphasis added). To that end, Section 512(h) does not give the court clerk any discretion: "*If the notification filed satisfies the provisions of subsection (c)(3)(A), the proposed subpoena is in proper form, and the accompanying declaration is properly executed, the clerk shall expeditiously issue and sign the proposed subpoena and return it to the requester for delivery to the service provider*." 17 U.S.C. § 512(h)(4) (emphasis added). Nor does it require

any involvement by the district court (unless and until, as here, a service provider files a motion to quash).

Section 512(h) is not unique. Congress has authorized the issuance of subpoenas in numerous other contexts without the need for a pending lawsuit, including, for example: "election disputes, 2 U.S.C. § 388, patent and trademark contests, 35 U.S.C. § 24, railroad employment arbitrations, 45 U.S.C. § 157(h), and plant variety protection proceedings, 7 U.S.C. § 2354(a)." *Charter Dissent*, 393 F.3d at 784. And "[t]here is no record that any of these statutory subpoenas have been held to violate the case or controversy requirement of Article III . . . ." *Id.* Similarly, under Rule 27 of the Federal Rules of Civil Procedure, federal courts are entitled to order the deposition of witnesses before a lawsuit is filed to "prevent a failure or delay in justice." Fed. R. Civ. P. 27(a)(3). The constitutionality of Rule 27 has never been in doubt. *See Verizon II*, 257 F. Supp. 2d at 252 (noting that Rule 27 "reflects traditional powers of the courts at equity dating from even before the adoption of the Constitution") (citation omitted).

For these reasons, Section 512(h) does not violate the case-or-controversy requirement of Article III. *See Verizon II*, 257 F. Supp. 2d at 248-57 (reaching the same conclusion); *Charter Dissent*, 393 F.3d at 783-84 (same); *see also* Brief for Intervenor United States of America in Response to Defendant's "Brief in Support

of Its Motion to Quash February 4, 2003 Subpoena and Addressing Questions Propounded by the Court on March 7, 2003," *Verizon II* (articulating the government's position that Section 512(h) is constitutional).

**C.    The Rightscorp Subpoena Is Not Procedurally Deficient.**

CBeyond contends that the Rightscorp Subpoena should be quashed because the subpoena and accompanying declaration do not explicitly state that Rightscorp is authorized to act on behalf of BMG, the rights holder whose works were infringed using CBeyond's network. (Mem. at 12-13.) This argument is meritless.

Section 512(h) requires three things:

(A)    a copy of a notification described in subsection (c)(3)(A);

(B)    a proposed subpoena; and

(C)    a sworn declaration to the effect that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title.

17 U.S.C. § 512(h)(2).

Rightscorp's request for a subpoena satisfied each of these three requirements. The notification attached to the Declaration of Dennis J. Hawk, Esq. provided the information described in subsection (c)(3)(A), which includes a statement that "Rightscorp, Inc. represents the following 'copyright owner(s)' BMG Rights Management (US) LLC ('BMG')." 17 U.S.C. § 512(c)(3)(A)(vi). The

request contained a proposed subpoena. And Mr. Hawk's declaration included the language set forth in subsection (h)(2)(C) (see ¶ 2).

Contrary to CBeyond's argument, neither the subpoena nor the sworn declaration is required to state explicitly that Rightscorp is an authorized agent of BMG. *It is the notifications that must include this statement*. The notifications attached to the Rightscorp Subpoena did just that.

**D.     CBeyond Has Not Demonstrated Undue Burden.**

CBeyond argues that Rightscorp's subpoena should be quashed because it would cause CBeyond to incur undue burden and expense. (Mem. at 8-11.) While "undue burden" can serve as a basis for a motion to quash, Fed. R. Civ. P. 45(d)(3)(A)(iv), CBeyond bears the burden of proof, 9A Charles Alan Wright et al., *Federal Practice and Procedure* § 2459 (3d ed. 2014). CBeyond has not satisfied its burden to quash the Rightscorp subpoena.

First, courts in this district and elsewhere routinely grant third-party discovery to identify infringers associated with IP addresses. *See Breaking Glass Pictures, LLC v. Does 1-99*, No. 1:13-CV-0882, 2013 U.S. Dist. LEXIS 76134, at *14-15 (N.D. Ga. Apr. 12, 2013) (citing cases). Regardless of whether the service provider acts as a conduit for infringing material, as addressed by subsection (a), or is caching, storing, or linking to infringing material, as addressed by subsections

(b) through (d), the burden of identifying infringing subscribers using an IP address is the same. As a result, these courts have all recognized that the information sought does not generally result in an undue burden on a service provider.

As noted above, the Section 512(h) subpoena provision is one of the obligations that Congress imposed on service providers in order for them to enjoy the confines of the safe harbors. It is a critical component of the compromise struck by Congress between well-documented and competing concerns. Without these concomitant obligations, rights holders are left without an adequate remedy.

Further, the evidence submitted by CBeyond to demonstrate undue burden is wholly insufficient to meet CBeyond's burden of proof. The affidavit of Chris Bunce submitted in support of CBeyond's motion to quash alleges that compliance with Rightscorp's subpoena would burden CBeyond as follows:

- "Responding to the Subpoena . . . would be extremely expensive and time-consuming for CBeyond." (Bunce Aff. ¶ 6.)

- "The records sought by Rightscorp's Subpoena are characterized by a monumental volume and their compilation would be unduly expensive." (*Id.* ¶ 7.)

- "In some instances, obtaining the personal and identifying information of CBeyond's subscribers would require manual lookups, which would further increase the already monumental cost for CBeyond." (*Id.* ¶ 8.)

- "CBeyond would also be required to incur significant legal costs to ensure that responding to the Subpoena does not violate state and

federal privacy statutes, and in notifying each user whose personal information was disclosed." (*Id.* ¶ 9.)

- "Given the extraordinary volume of the subscriber lookups involved, the electronic information sought by the Subpoena is not reasonably accessible because providing such information would impose an undue burden and extraordinary cost on CBeyond." (*Id.* ¶ 10.)

CBeyond fails to explain why providing this information would be burdensome, including the steps that CBeyond would need to take and the resources it would need to devote to identifying the very limited information requested by the Rightscorp Subpoena (i.e., merely the name, address, telephone number, and email address of the infringing subscriber).

Courts routinely reject these sorts of conclusory allegations. *See, e.g.*, *Tropical Mktg. & Consulting, LLC v. Glock, Inc.*, No. 6:12-cv-1388-Orl-36TBS, 2012 U.S. Dist. LEXIS 159697, at *9 (M.D. Fla. Nov. 7, 2012) (finding burden not satisfied where movants had "not explained why responding to the subpoenas will be unduly burdensome, what exactly, the burden will be, or how their current lack of income makes responding to the subpoenas unduly burdensome"); *Ameritox, Ltd. v. Millennium Labs., Inc.*, No. 12-cv-7493, 2012 U.S. Dist. LEXIS 177809, at *6 (N.D. Ill. Dec. 14, 2012) (finding "bald assertions" insufficient to satisfy burden). And that is particularly true for a company the size of CBeyond, which has 1,400 employees nationwide and annual revenues of approximately $700

million (see www.birch.com/about), because "the burden of production must be compared with the size of and resources available to the responding party." *United States v. Int'l Bus. Machs. Corp.*, 83 F.R.D. 97, 108 (S.D.N.Y. 1979).

Lastly, even assuming *arguendo* that there exists some hypothetical undue burden, "modification of a subpoena is preferable to quashing it outright." *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004). And for that reason, "[t]he burden [of demonstrating undue burden] is *particularly heavy* to support a 'motion to quash as contrasted to some more limited protection.'" *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 404 (D.C. Cir. 1984) (citation omitted; emphasis added) (finding burden not satisfied).

CBeyond's conclusory allegations do not provide this Court with the necessary detail that would be required to make any meaningful modification to the Rightscorp Subpoena to address the purported burden. For example, by decrying that "some" of Rightscorp's requests would require "manual lookup," CBeyond acknowledges that many, if not most, of lookups would be automated. For transparent and self-serving reasons, CBeyond does not identify which IP addresses require manual lookup, why they require manual lookup, or why compliance with the subpoena for these IP Addresses would be burdensome. In

23

sum, CBeyond falls well short of meeting its burden to prove a sufficient burden quash the Rightscorp Subpoena.[4]

For all the same reasons, CBeyond has not provided any basis for requiring Rightscorp "to pay for the cost of complying with the Subpoena." (Mem. at 11.)

E.     **Sanctions Are Not Warranted.**

CBeyond contends that it is entitled to recover the attorneys' fees that it incurred to file this motion to quash because Rightscorp's position is frivolous in light of *Verizon III* and *Charter Majority*. (Mem. at 13-15.) Even if CBeyond were to prevail on its motion to quash (for all the reasons stated above, it should not), the issues presented by this motion are of first impression in the Eleventh Circuit. And previous opinions—namely, *Verizon I*, *Verizon II*, and *Charter Dissent*— support Rightscorp's position. Accordingly, CBeyond's request for sanctions is neither reasonable nor supported. *See Estiverne v. Sak's Fifth Ave.*, 9 F.3d 1171, 1174 (5th Cir. 1993) (declining to award sanctions where the issue was one of first impression in that circuit); *see also Varlesi v. Wayne State Univ.*, No. 10-14793, 2013 U.S. Dist. LEXIS 42568, at *10 (E.D. Mich. Feb. 25, 2013) (noting that a

---

[4] CBeyond also contends that it would "be required to incur significant legal costs to ensure that responding to the Subpoena does not violate state and federal privacy statutes, like the Electronic Communications Privacy Act . . . ." But Section 512(h) provides that a subpoena should issue "notwithstanding any other provision of law." 17 U.S.C. § 512(h)(5). And to the extent this constitutes a burden, it also exists for subpoenas to subsection (b) through (d) service providers.

decision was "not controlling precedent in this circuit and therefore [did] not demonstrate frivolousness in bringing such claim in this circuit"); *Baaske v. City of Rolling Meadows*, 191 F. Supp. 2d 1009, 1018 (N.D. Ill. 2002) ("Baaske's claims raised two issues of first impression in this circuit. Therefore, the court cannot conclude that his claims were frivolous, unreasonable or without foundation.").

## IV.   CONCLUSION

For all the foregoing reasons, CBeyond's motion to quash the Rightscorp Subpoena and for sanctions must be denied.

This 8th day of December, 2014.

Respectfully submitted,

/s/ Lisa Moore
Lisa Moore (Georgia Bar No. 419633)
THE MOORE FIRM, LLC
Suite M-102, 887 West Marietta Street
Atlanta, Georgia 30318
(404) 748-9596 (telephone)
(404) 565-2941 (facsimile)
lisa@themoorefirm.com

Michael O. Crain (Georgia Bar No. 193079)
CRAIN LAW GROUP, LLC
Suite 24, 297 Prince Avenue
Athens, GA 30601
(706) 548-0970 (tel. & fax)
mocrain@crainlawgroup.com

*Attorneys for Rightscorp, Inc.*

## <u>CERTIFICATION AS TO FONT</u>

In accordance with Local Rule 7.1(D), the undersigned certifies that

RIGHTSCORP'S RESPONSE TO CBEYOND'S MOTION TO QUASH

SUBPOENA AND FOR SANCTIONS was prepared with Times New Roman 14,

a font and point selection approved by the Court in Local Rule 5.1(C).

DATED: December 8, 2014

/s/ Lisa Moore
Lisa Moore
Georgia Bar No. 419633

## CERTIFICATE OF SERVICE

This is to certify that, on December 8, 2014, I electronically filed RIGHTSCORP'S RESPONSE TO CBEYOND'S MOTION TO QUASH SUBPOENA AND FOR SANCTIONS with the Clerk of Court using the CM/ECF system, which will automatically send email documentation of such filing to the following attorneys of record:

D. Lee Clayton          lee.clayton@swiftcurrie.com

DATED: December 8, 2014

/s/ Lisa Moore
Lisa Moore
Georgia Bar No. 419633